Our case for argument is Stephenson v. Neal. Ms. Donnelly? Good afternoon, and may it please the court. I'm prepared to answer any questions regarding all four arguments today, but I intend to focus on the first two. One is the first argument we alleged. We have made a truly persuasive demonstration of Mr. Stephenson's actual innocence. The second issue involves two very serious discrete instances of juror misconduct regarding the first issue. The evidence of innocence in this case came to Mr. Stephenson's attention through the state during post-conviction proceedings after the hearing and the judge had made his decision, but before had gone up to appeal. So the proceedings were state. And this evidence consisted of a witness, Chad Adams, who said he was present at Mr. Mossberger's house that evening, and that it was Mr. Mossberger, Stephenson's accuser, who had actually committed this crime, and not John Stephenson. This evidence was presented in Mr. Adams' deposition, as well as the depositions of other individuals, some of whom were able to confirm at least some of what Mr. Adams said in his deposition. He passed a polygraph that was presented to the state courts, and they did nothing. They didn't have a hearing. The trial court made no findings. He didn't weigh the evidence. And when it went to the Indiana Supreme Court, they said, well, this could have been presented earlier, although there was absolutely no evidence to that effect, and in fact, the evidence suggested otherwise, and didn't review the merits of the claim. They dealt with it mainly in a footnote. I find that disturbing. We raised the claim here in federal court, or in the district court, and the district court certainly discussed the issue more thoroughly than the state courts had. But again, and I have to disagree respectfully with the district court, said that it was too confusing. There was too much conflicting evidence for her to reach a decision. She did not need to have an evidentiary hearing. It was too conflicting. I don't think the issue is conflicting at all. The evidence is conflicting at all, or complicated. This was a very, very long trial. There were a lot of witnesses, but there were two that mattered. Mossberger, Brian Mossberger, and Dale Funk said that John Stevenson chased after the truck that contained the three individuals that were murdered, Jane, Kathy, Tyler, and Brandy Southard, and that he came back and said that he killed them. There were many reasons given, multiple reasons given, at trial to disbelieve this testimony. What they didn't have was anyone who would say otherwise. Chad Adams comes in. He does not have an agenda. He was not the person like Brian Mossberger who was caught with a murder weapon. He is someone who has no agenda, has no reason to lie, is not a friend of John Stevenson. This is someone who the jury very well could have believed. It certainly, at a minimum, would have created a reasonable doubt in the context of this case. He knew Mossberger, did he not? He actually didn't know Mossberger very well. His cousin, Donald Goodman, knew Mossberger. He had purchased a Porsche from him, and that's why they were there working on it. So he did know who Brian Mossberger was, but he didn't know him very well either. Well, district court says he was working on a car with Goodman at the house. Right, exactly. So yes, he went over. He must have had enough of a relationship with Mossberger to be under the curtilage, right? Well, my understanding from his testimony was his cousin who had a relationship with Mossberger to the extent that he bought the car from him, and he went over there with him. So he didn't know him in the sense that he met him that night. But he wasn't, I believe his testimony was he wasn't good friends with any of the people that were there. Is it surprising that Adams doesn't appear earlier if he's at the party, one of the people at the party? Why is Adams such a late arrival to this vignette? Because according to Adams, and according to his mother also, he was terrified. He thought he would be killed if he said anything. And that is a theme that arises a lot in this case. There were a lot of threats made in this case. The defense counsel was threatened twice in this case and had to notify the police about that. There were many instances where other individuals were threatened, including the victims. And what he said made sense, which was Mossberger told Donald Goodman, according to them, that while Goodman had seen him covered in blood, that he would kill him or his family if there was anything here. That's a legitimate reason not to come forward. This is a young man, and he has a baby on the way, and he was afraid. And I'm not saying that's how we would want everyone to act, but it's certainly very plausible and explains why he didn't. There's certainly no reason for him to come forward now with this information unless it's true. In fact, he doesn't actually come forward. He is overheard talking about it, and the police come to him. And that's when he gives the information. There's no indication of any agenda that he could have or plausibly have regarding this information. And the story he tells is very, very astonishingly close to what Mossberger actually said happened, except that he switches it with Stevenson to Mossberger. And I think that's important, because I think that he's not making up things out of thin air. He's not telling a totally different series of events. He's not using a time frame that's completely implausible or anything else. He's telling it, saying things that are consistent with what Mossberger himself said, even down to very seemingly insignificant details. What do you mean in your conclusion when you say case remanded for a new trial and or penalty phase hearing? On this claim? Between a new trial and a penalty phase hearing? On this claim or in the conclusion of the entire brief? I'm looking at your conclusion. In the entire brief? Your conclusion in the entire brief. Well, there are four different claims here. The first two were asking for his conviction to be reversed. And in the second two, they only pertain to the death sentence. So if it's inaugurately worded, I apologize. That isn't actually what you say. I thought it was puzzling. When you say reverse and remand for issuance of a conditional writ vacating Stevenson's conviction and or death sentence, in the case remanded for a new trial and or penalty phase hearing. Right. Well, if he reverses conviction, that would. I'm sorry. Four different things. So what do you want? Well, I would like you to reverse his conviction on claim one or claim two. And what, throw out the convictions or have a new trial or what? Acquittal or what? I don't think that there's any claim that I raised in here that is sufficient for me to ask for an acquittal where he could not be retried. That would be a sufficiency of the evidence claim that. So you want either a complete new trial or just a penalty phase proceeding. Is that correct? Penalty phase proceeding in the last two. Why do you say or? You're indifferent between them or what? I think that's because it was the conclusion at the end of the brief. And I was trying to encompass all four arguments. Yes, therefore what? So therefore, I used and or. And again, I apologize if it was confusing. What are you talking about? Do you want the and or the or, neither, or indifferent, or what? I would like a new, Mr. Stephenson's convictions to be vacated. But if it's not. If it's not. If you are unsuccessful on the actual innocence. Or the juror issue, yes, I would like. Juror issue, your position, I assume because of mitigation and the issue of mitigation and the Stenvote, it causes you to want a new hearing on the penalty phase. Correct. That's absolutely correct. OK. So you're giving up on the convictions? You just want the penalty? Your Honor, I am definitely not giving up on the convictions. I do not think Mr. Stephenson committed this crime. I think there's compelling evidence that he did not commit this crime. I also do not believe that he had a fair trial, that he had a fair and impartial jury. And I think he deserves a new conviction, to have his, excuse me, not a new conviction. He deserves to have his convictions vacated and to be remanded for a new trial if the state chooses to retry him. I mean, that's usually what the orders say, from my recollection. How old is he now? I believe he's around 50. 50. OK. I'd like you to spend some time, if you would, on the last two issues. On the last two issues. OK. I don't mean to exclusion of your arguing the others, but I'm particularly interested in the mitigation and the stand-by. Well, regarding the last two issues, and I'm going to talk about them together, if that's all right, because we've argued that the prejudice must be considered together. The last two issues, Mr. Stevenson's trial counsel presented no evidence on his behalf at the penalty phase. In this day and age, or time of this trial, which was even 1997, that was unheard of. Maybe in 1980, lawyers thought that was OK. By the time of this trial, there was no way. A death sentence is a foregone conclusion under those circumstances. The Indiana Supreme Court said that. The only thing that they argued was they put up briefly a woman who was from the Indiana State Prison, never met John Stevenson, who said, oh, well, there are many people who have committed multiple murders. In general population, we are able to control them. She said that very succinctly. And in his argument, which we reproduced in the appendix of our brief, which was very incoherent, went off on a lot of tangents. But it did cover that. That's, go ahead. Do you rely heavily on the district court's observation that there could have been evidence of mitigation that wouldn't have opened the door to other conduct? I rely on that. I do believe that before we get there, that the standard under Strickland in the Supreme Court has been crystal clear that no matter how good or bad the strategy is, unless counsel has done a thorough investigation, we don't give deference to that. And in this case, counsel definitely did not do a thorough investigation. He did not investigate the prior crimes that he thought were so important that he used as an excuse to not do the rest of the investigation. He did not do a thorough investigation in the background. So I don't think across the board, but yes. Ms. Donnelly, it seems to me there was a general inquiry as to what occurred in Texas as a young person. Very little. And the witnesses that he said he talked to testified to that. They said, well, he spent a half an hour, didn't really talk very thoroughly. And I think that that is important, because this is something where he needed to understand what was available in the totality before he could make a decision about what to present and what not to present. Is it also your position that even if the door was opened to other bad acts, it was a poor decision by the counsel not to go that route? It is my decision that, or my position that, there was a plausible alternative. He could have, and there was testimony about this from other very expert, experienced death It is possible to, there are many cases where the prior convictions come in, counsel deals with it. They're dealing with a much more serious crime. They use the mitigation for that. More serious crime than this? More serious crime than the crimes here? Well, what I was saying was that the crime here is more serious than the prior convictions. But yes, there are cases where there are more serious crimes. There are cases where there have been four victims. There are cases where little children have been murdered. So yes, there are more serious crimes. How relative? How relative depends how you look at it. It is absolutely relative. And I don't mean any disrespect to the individuals or their families in this particular case, just to be clear about that. But what I was actually saying was the more serious crime, in this case, the homicide that he was on trial for, was far more serious than the prior convictions that they were afraid of letting in. So he could have done that. I'm not saying that this court should or even could hold that that would be the only thing to do. I think he could have made a reasonable choice to go one way and say, I'm going to go and put everything in and deal with these prior convictions. Or he could have done the opposite, or the other, and just put in the evidence that would not have opened the door. But he was not prepared to make that decision. It was logically impossible for him to make that decision because he had not done a complete investigation. That is my argument on the performance problem. And I believe that between the jury, the only argument he did make was trying to allege that Stevenson could be managed in prison and would not be a future danger. But what the jury was seeing throughout the trial was someone who was tried in a stun belt, which, as the Indiana Supreme Court said, and as this court has said, is something that certainly creates the opposite impression. In addition to that, not presenting any other evidence, the jury heard nothing. They could have heard a much more compelling story, something that would humanize him, grant compassion, mitigating factors that jurors have considered and have used to decide not to sentence someone to death in other cases. This kind of evidence was available for him to in either scenario. I'm going to go back to issue two. Claim two regarding the jurors in this case, the juror misconduct in this case. In this case, we had the jury foreman, who was a journalist, who prepared a 430-page notebook. Every night, he would go home and type it on his computer. It was very extensive. He had a reason for wanting to stay on this jury, failing to disclose that he had a relationship, someone that he knew was a member of the victim's family. There is no question, I don't think, in this record, that that would have had him struck for cause. There were jurors with far more tenuous relationships with members of the, for example, the lead investigating officer's nephew was dating one juror's niece. They didn't even know about it, and there was no evidence the juror knew about it, but that person was struck for cause. I don't think there's any question that we've met that standard. The other issue, because it wasn't just one, was the jurors were discussing during this trial prior unadjudicated misconduct, the very misconduct that counsel was so afraid of coming in. It was definitely inadmissible. It's inadmissible because it's prejudicial. And in that instance, there were jurors overhearing the discussion going on. The trial court had been very clear. They had taken months to select this jury. He had given a very clear order, which the jurors had to sign. Each juror had to sign that they understood the instructions and they understood they weren't supposed to do this. Obviously, this was evidence that, as in Weishart, Mr. Stevenson had no opportunity to confront. And I can see no clear distinction between there and in this case. I see no material distinction. The Indiana Supreme Court there and here did not apply the appropriate standard. And we would ask for that in that case, in that instance, for there to be his conviction to be reversed or to remand, as the court did in Weishart, to the state court for a hearing on that matter. And I'm going to be very blatant. And I've never had a court ask this few questions. So this case has been examined pretty carefully by several courts. I mean, the issues are pretty clear. What would you say is the strongest argument you have, if actual innocence doesn't carry the day, for the accumulation argument? The strongest argument, if we, on the penalty? As it would affect the penalty. The strongest argument as it would affect the penalty. The strongest. For example, why the Stenbelt issue would be graver in the penalty phase than perhaps in the guilt or innocence phase. Well, in the penalty phase, or excuse me, in the guilt and innocence phase, the jurors are at least not supposed to be considering the character of the offender. They're supposed to be considering simply the facts and the facts prove beyond a reasonable doubt to commit. The penalty phase is all about the character of the offender. And having seen someone unusually, which is not the norm, being tried in a Stenbelt, which, as the Indiana Supreme Court could be perceived as even worse than shackles, because it seems like he's someone who cannot be controlled. And even in a courtroom, someone who's in the custody of the sheriff and cannot be controlled, I think is very prejudicial at that stage. So even if it were not, as this court held, it was not prejudicial at the guilt phase, certainly it could also certainly be much more prejudicial at the penalty phase of the trial. It also undermined the only argument counsel made, or the only coherent argument counsel made on his behalf, which was that he wouldn't be a future danger. I also think that having a trial, or having someone where you have evidence that stating clearly that he didn't do it, should at least have a court be willing to have a hearing and weigh the evidence. And that has not happened by anyone in this case. I also think it should be taken very seriously when jurors are not impartial, clearly not impartial, and clearly not following their instructions. So I would urge the court to consider vacating his conviction. That is what I would, to answer your earlier question, that is what I think would serve justice in this case. Is that it? I would like to reserve the rest of my time. Thank you. OK, thank you, Ms. Donnelly. Ms. Lloyd? Thank you. May it please the court, this court should affirm the district court's denial of habeas relief because the district court properly found that Mr. Stevenson was not prejudiced in the penalty phase for having worn a stun belt, that the Indian Supreme Court Why did he, why was he made to wear a stun belt? That was a security decision made by. Yes, well, what was the, what was the reason for thinking that if he didn't have a stun belt, he'd go crazy in the courtroom and strangle people and whatever you do when you go crazy in a courtroom? I believe it had to do primarily with the nature and the circumstances of the crime and the. Well, the nature and circumstances of the crime have to do with knives and guns, which would not be the concern in a courtroom. Yes, but there were also threats to witnesses. Why did they think that he would go berserk? Is there some basis in his background for thinking that he's violent in the sense of not requiring a gun or a knife to go around attacking people, or what? Well, part of the facts were that Mr. Stevenson had threatened some of the witnesses. So I think there was an effort to be proactive to maintain security in the courtroom. And at the time that stun belts were used, this was a. See, I don't believe it, and the reason I don't believe it is that if I were a prosecutor, I would think it'd be great if he went berserk in the courtroom. He'd immediately, he'd be convicted, obviously. If somebody got killed in the process, it's only collateral damage, what the hell? I do not know what the prosecutor was thinking, Your Honor, because it was strictly a decision made between courtroom security and the trial court. And the prosecutor, I don't know. I don't understand why it would be in the interest of a prosecutor. Maybe it wouldn't be, that's what you're saying. Why is it would be in the interest of a prosecutor to have a manacled or a stun belted defendant? I don't know that it, I think it would be in the interest of a prosecutor to maintain the courtroom, Your Honor. No, he wants a conviction. He doesn't care about the courtroom. Why would he care about the courtroom? If the defendant goes berserk in the courtroom, that will surely enhance the probability of a conviction, won't it? I think, Judge, you're being unfair to the prosecutor. You don't know? I think it would depend on the circumstances. It would depend. He goes berserk, and the jury says, well, people do things like that. We're not going to hold it against him. They may not hold it against him. He tried to strangle a witness. I don't think you're being realistic at all. I don't think jurors, if they're sitting in the jury box, have not been under the pressure of any particular defendant in facing a capital trial. So it may be something that a juror would not find the defendant to be guilty, mainly because he had an outburst in the courtroom. Now, wait, you're saying they wouldn't find him guilty because he had an outburst? To be biased, based solely on the fact that he had an outburst in the courtroom. Realistically, it would result in a mistrial, so he'd start all over again anyway. It could very well result in a mistrial, which would not be in furtherance. I think a prosecutor would want a mistrial. As you said, they want a conviction. If he went berserk, why would that lead to a mistrial? Because the trial court could have found that it prejudiced the defendant and would have granted a mistrial. Wait, the defendant goes berserk, and the judge says, well, you went berserk, and therefore, you're entitled to a new trial? I think that could be a different trial court. In other words, if you're a defendant, you want a new trial, you should go berserk? No, Your Honor, not necessarily. Hey, what sense does that make? Since I raised the question of whether they would call for a new trial, the short answer is the jury can no longer be impartial in judging him because he has made a behavior. That's why they throw the defendant out of the courtroom if he's not going to behave himself. So the jurors do not see that acting out. Part of it is safety. Part of it is to preserve the trial itself. And I was a prosecutor, and I didn't have any problem with worrying about if a defendant has manifested an ability to, whatever is available to him, attack people. I thought he should be shackled or held in place, and the stun belt is just part of it. So I'm not answering his question for you. I'm asking him for myself. So there you go. Thank you, Your Honor. If security was a concern on the guilt phase, this is a very long trial. It was a very long trial. I suspect one of the longest trials in Indiana capital history. Yes, Your Honor. At least very costly. Yes, Your Honor. But we had no incident in this very long trial. Correct. And now we come to the penalty phase. And we have a case where, arguably, one could question the decision of the defense counsel on the approach to mitigation. So what gives me concern is if we have a less than stellar performance on mitigation at the penalty phase. And we have the stun belt issue continuing to underscore, at least in the eyes of some jurors, a perception of dangerousness, which doesn't seem to have played out during the course of a very long trial. Do you think, at that phase, that there might be sort of an extra prejudice attendant,  Because we have this stun belt issue. Together with what I consider some concern on the mitigation. The short answer, Your Honor, is no. Specifically regarding the stun belt, I have four main reasons why wearing the stun belt did not overly or unduly prejudice Mr. Stevenson. Let me state my nose on it. Who requested the stun belt? The deputies and sheriffs who were covering the trial? The prosecutor? Or did the judge dream it up on his own? I believe it was the sheriff, Your Honor, in charge of security. Because at the time of Mr. Stevenson's trial, the stun belt was something that was a new tool. Requested by the police authorities, then? Yes, Your Honor. Those that were responsible for the safety of the people in the courtroom? Correct. Not the judge and not the prosecutor? Correct. I believe the trial court relied on the security in order to make the best of it. I assume they went the way it usually does in courts where the security people request the stun belt. But wouldn't the jury think that the fact he was wearing the stun belt meant that the prosecutors, or the judge, or the courtroom deputies, or what have you, thought he was a dangerous person? No, Your Honor. Why not? I can think he's a dangerous person. He is a dangerous person. That is the perception of the use of restraints. The charge itself indicated he was a dangerous person and their belief therein. By the time that Stevenson reached the penalty phase, he had several months of wearing the stun belt and did not have any incidents. So Mr. Stevenson goes to the penalty phase no longer proposing innocence. You're missing the point. The question is, wouldn't a jury think there's a reason why this person wears a stun belt? Or does every criminal defendant in this court, this district, whatever, made to wear a stun belt? I don't think there's any indication that the jury's. Now answer me, would you please? Is every criminal defendant in this court required to have a stun belt? That information is not in the record. Well, you must know as a prosecutor. Just say no, it's easy. This trial was shortly after. I'm not talking about this trial. I asked you a simple question. Are the criminal defendants in this courthouse always stun belted? I would need a frame of reference, but no, not any longer, Your Honor, because the Indiana Supreme Court ruled that. I'm talking about the period of this trial. OK, during the period of this trial, it was from the record that this was a new restraint used by the security. The point is, were you familiar with the trials of the court in the county in which this occurred? I'm sorry. Have you been a trial lawyer in the county where this was? You were not there during the period of time of this trial. You were not a trial lawyer. No, Your Honor. So you have no personal knowledge of what was done there. That's correct. But your educated guess is that it was not being used. If somebody came in and was charged with stealing a loaf of bread by snatching it off, he was not forced to wear a stun belt, was he? I would guess no, Your Honor. Well, that's a good guess. OK. But there is testimony about that. Stick with that. OK. But I want to be clear, though. In the post-conviction hearing, there was testimony from some of the courtroom personnel about the use of the stun belt. And so it's my recollection, based on their testimony, that this was, in fact, a new device, that they did use it again, but eventually chose not to use the stun belt. But at the time, it was a new device being used in courtroom security. It was a what? It was a new device being used for courtroom security. He was the first, Stevenson? Your Honor, I do not know that. What is the date of Wrinkles, 2001? It's in early 2000, yes, Your Honor. So is there any reported cases in the Indiana criminal system on the number of stun belts that have been used? I do not know the number of cases where stun belts have been used. Because if you say it was relatively new in 97. Correct. And it was outlawed in 2001. Correct. We only have a four-year period. Correct. But I have personally handled several cases where the stun belt has been used. I recall a testimony, or the record in the case when it was before this court before, where the attorney for the defendant appearing here, the appellant, said that one juror was looking for it because it was so new that it was publicized either on television or in newspapers. And he was looking for it. And he said he found it. One of the other jurors said he knew he found out about it, but he didn't find out about it until after the trial. And the other one said he didn't know when he found out about it. Those are the three. But it was new enough so that it was a matter of newsworthiness before the trial. And it was in the abstract, not attached to this trial at all. Do you recall any of that in the record before it? I do remember a particular juror saying that he expected that some form of restraint would be used, and that he thought it was a stun belt because he didn't see any other form of restraint. That's correct, Your Honor. But particularly with Mr. Stevenson's case, we're looking at- Has a date of execution been set? No, Your Honor. It's currently stayed. What do you want to execute a 50-year-old for? Because he committed triple murder, and he was found by a jury who recommended the death penalty. And that was ordered by the trial court. And the result of his trial was fair. You know, only 1 8th of convicted murderers are executed. Do you know that? I did not know that statistic, Your Honor. Why wouldn't it be enough punishment for a person like- the alternative is life in prison, isn't it? That's one alternative, Your Honor, yes. Well, why wouldn't that be adequate? For Mr. Stevenson? Rotting in prison for the next, I don't know, 30 years? And he's been there for a long time already. Why isn't that enough? Because the jury recommended a capital sentence that was- You don't execute. Not all capital offenders are executed, even in Indiana. That's true, Your Honor. Yeah. So why are some executed and some just given life? Women are the judges, that's all. Because the ones that are executed have gone through the rigors of the appellate system. And the trial has been deemed reliable and has not been in violation of the Constitution. But wait a second. The ones who are not sentenced to death, they did have a reliable trial, surely, or they would have been acquitted. So are you saying that the only people executed- Who are executed are people who have reliable trials? Sorry, Your Honor, I misunderstood your question. I thought you were comparing it to other capital defendants that are not ultimately executed. And one reason for that would be because there were inaccuracies or constitutional violations found in their- But then he wouldn't have been sentenced to life imprisonment if there were constitutional violations in his criminal trial. What are you talking about? That when there have been violations of the Constitution- They're always executed. Pardon? But if his conviction is unconstitutional, he's not going to be given life imprisonment. Not by default, Your Honor. It would require additional proceedings. What are the differences between the murderer who is executed and the murderer who is just given life? Under that hypothetical, it would be the sentence, Your Honor. It would be what? It would be the sentence. The difference between the two. My question is, why does one person get life and another person is executed when they're both murderers? I think it would depend on other people. An imponderable question, my dear. Depend on what? It would depend on what? It would depend on other factors. Like what? Well, in this case, for example, there's some ambiguity about whether he's the killer or Mosberger or Funk. And you have this Adams testimony. Not clear that this is an open and shut case. I disagree, Your Honor, that there is ambiguity as to whether Stevenson was the one who committed the murders. Well, why isn't Mosberger a possibility? I think Mosberger, the jury heard the evidence regarding Mosberger and found that Stevenson was the one that was culpable. You think juries are infallible? Is that the point?  I agree. Why is it so improbable that Mosberger borrows the gun from Stevenson and shoots the people in the car? What's so improbable about that? That does not comport with Mr. Funk's witness, Dale Funk. Yeah, I know. These are not very reliable people, surely. Well, there's no evidence. They're all criminals. The jury believed him, didn't they? The jury believed him. They're all criminals. Right? They're all criminals. Funk, Mosberger, Stevenson. I don't know that, Your Honor. I can't answer that. Well, you don't know they're criminals? No. OK. Well, Mosberger had a record. He just didn't enter the case. He had been a convicted felon. Correct. He had an older conviction. You're right. Correct, Your Honor. Yes. Anything else you want to say? If there's one salient point that I could point out regarding the stun belt is that the jury rejected two out of the three aggravators that the state proposed. And so if there was any one point that showed that the jury was not biased by the use of the stun belt was that the jury conscientiously looked through the evidence and found simply that he committed multiple murders, intentionally committed multiple murders. And so that shows conclusively that the jury was not biased by the use of the stun belt. What are the two that they rejected, Ms. Floyd? That Mr. Stevenson intentionally killed while lying in wait and that Mr. Stevenson intentionally killed by discharging a firearm from a vehicle. And those were the two that they rejected. There are no further questions, Your Honor. Thank you. OK, well, thank you, Ms. Floyd. Thank you. So Ms. Donnelly, you have more time or something? Yeah, you can have a minute or two, however much you need. Thank you. In this case, the reason that John Stevenson was sentenced to death is because his lawyer didn't do what he needed to do to protect him. You have to speak up. I'm sorry. In this case, the reason that John Stevenson was sentenced to death when other defendants are not is what? When other defendants are not, I'm referring to the question asked earlier of my colleague. It's because his lawyers didn't do what they needed to do. How many cases have you tried? How many have I tried? Yeah, as a lawyer, how many have you defended? I'm not a trial lawyer. You're not a trial lawyer? No, not at all. I've only done appellate cases. My, my, OK. You've been reviewing cases for some filing on appeals, have you not? For appeals, state post-conviction, and habeas cases. I've also consulted on capital trials. And I've been doing that. You've won some and you've lost some. Or have you won them all? I've won more than I lost. But I have certainly not won them all, no. That's right. But you don't really know why. You're still the same lawyer. Just as good or bad cases you lose is the case you win, right? I think in some cases that's true. I think some cases, you know, I can certainly guess myself. All the ones you lost were your fault. Sometimes it feels that way. No, I don't believe that for a minute. And I don't think you do either. Is it your argument that the trial attorney didn't do an adequate job, in fact, an inadequate job, as to mitigation? Absolutely, that is my argument. I hear that argument. Thank you. But as to the rest of the trial, what are the, would you say, the two or three strategic errors that you feel that the counsel, that you feel, did not represent Stevenson adequately? Stevenson at the guilt phase of the trial? At the guilt phase. We have no claims other than the claim that has already been rejected, which was the claim regarding the Stun Bell. There were a handful, very few claims raised at post-conviction. We did not even raise them at federal court. Actually, there doesn't seem to be a very strong argument for inadequacy of counsel at the guilt phase. No, there's no argument. I absolutely see that. I think when you make the claim about counsel, I would think you would want to underscore that where the letdown occurred was at the penalty. Absolutely. I absolutely wish to underscore. It was the penalty phase of the trial. This lawyer at this penalty phase did not do an adequate investigation. There were two different lawyers, by the way. They were both. No, I understand. They're what lawyers? I'm sorry. They were two different lawyers. Were they experienced lawyers? The trial lawyer, or excuse me, the lawyer handled the guilt phase, had been a prosecutor in Ward County since the late 70s. And he had no experience on death penalty cases, which is why he left the mitigation phase to the other attorney. The other attorney had tried, or had handled, one other death penalty case, and he had been since found ineffective in that case, where he handled it to the penalty phase for not investigating and presenting evidence. He was found ineffective by the Indiana Supreme Court. That was Vincent Prowell's case was the name. Mm-hmm. I think that, as I said in the beginning when I started to talk about this, there are not very many cases that you're going to see. Certainly not in this later time frame where counsel has not put up any evidence on behalf of this client. There were obviously, as even the district court acknowledged, there were evidence that could be presented, including evidence of sexual abuse, evidence of a alcohol and drug problem that began very young in life, something that there was a lot of evidence that could have provided a context for that and understood how that affected his behavior. I think that this was very strong. I think that, combined with the fact that you have a, that they did not object to the stun belt, that they allowed their client to be tried before the jury in a stun belt when his dangerousness would certainly be an issue, at least at the penalty phase. The combination of those. I would also point out that our argument regarding the jurors is that the juror can be affected at the penalty phase as well as, and we made this in our argument. What's the size of this county, if you know? I honestly don't know the size. It's small. It's in rural Indiana, very far south. How far south is it? It's near the border towards Kentucky. It's near the border with what? With Tennessee, is that? Kentucky, I believe that is. Maybe your opponent knows the size of the county. No idea? If there are no further questions, I would ask that the court please vacate Mr. Stevens' convictions regarding the first two issues, or vacate, at a minimum, vacate his death sentence and remand for a new penalty phase regarding the latter two issues. OK, well, thank you, Ms. Donnelly and Ms. Loy. Case will be taken under advice. Before you disappear, I want to congratulate both counsel for an excellent job. Did a good job in drafting an argument. Thank you. Thank you.